**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 08-6519**

———————

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

REGINALD LAMONT REAMS,

            Defendant - Appellant.

———————

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  N. Carlton Tilley, Jr.,
Senior District Judge.  (1:99-cr-00013-NCT-1)

———————

Argued:  October 27, 2009          Decided:  December 30, 2009

———————

Before TRAXLER, Chief Judge, and NIEMEYER and AGEE, Circuit
Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Mark Everette Edwards, EDWARDS & TRENKLE, PLLC, Durham,
North Carolina, for Appellant.  Sandra Jane Hairston, OFFICE OF
THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for
Appellee.  **ON BRIEF:** Anna Mills Wagoner, United States Attorney,
Greensboro, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Reginald Lamont Reams was convicted by a jury of possession with intent to distribute cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1), and sentenced to 327 months imprisonment. Reams now challenges the district court's denial of his motion for a new trial on the basis of newly discovered evidence. See Fed. R. Crim. P. 33. We affirm.

## I.

Reams's conviction arises out of a crack cocaine sale that occurred on October 3, 1998, in Durham, North Carolina. On that day, John Mosely, a paid informant for the Durham police, notified his contact officer that he had arranged to purchase crack cocaine from Reams at a carwash. The officers searched Mosely and his vehicle and followed him to the carwash, which they then placed under surveillance. When Mosely arrived at the carwash, he lifted the hood of his car to feign car trouble and stayed in the carwash bay. Reams, accompanied by his uncle, arrived at the carwash after Mosely, got out of his vehicle, and got into Mosely's vehicle. Shortly thereafter, Mosely got out of the vehicle and walked to the trunk under the pretense of getting a scale to weigh the drugs. Once there, he lifted his hat in accordance with the prearranged signal to the police that the drugs were present and the arrest could be made. Mosely

2

testified that he was paid approximately $900 for his participation in the controlled buy.

In addition to Mosely's testimony, the government presented the testimony of three Durham police officers. The officers confirmed that they conducted a pat-down search of Mosely for contraband and searched Mosely's vehicle, including under the hood, in the trunk, and in the passenger compartment, prior to Mosely leaving the police station to meet Reams. They then followed Mosely to the carwash, keeping him within their sight at all times, and set up surveillance to observe the transaction at the carwash. After Mosely gave the prearranged signal, the officers moved in and handcuffed all three men. A plastic bag containing 54.5 grams of crack cocaine was found on the front seat of Mosely's car, in between where the men were observed to have been sitting. An additional 6.7 grams of crack cocaine were found in Reams's pocket. The drugs were worth approximately $2,000. The officers also seized from Reams a total of $324.34 in cash, a pager, and a cellular telephone. Immediately after his arrest, Reams told the officers that they "may as well let [Mosely] go now, I know he set me up." J.A. 43. After arriving at the police station, Reams told the officers that his uncle had nothing to do with the transaction. Reams also asked how much jail time he would face for drug trafficking. He told one of the officers that "he had an

3

alcohol problem and ever since then he had sold drugs to pay his way through technical school." J.A. 49. At no point during this time frame did Reams deny that he was at the carwash to traffic in crack cocaine, or claim that the crack cocaine found on the seat belonged to Mosely.

At trial, however, Reams testified that he was a potential buyer in the transaction, and that the 54.5 gram bag of crack cocaine belonged to Mosely. Reams testified that he was a crack cocaine user and that the 6.7 grams of crack cocaine seized from his pocket was for his personal use. He testified that he had met Mosely at a crack house in Durham and Mosely told him that he had a better grade of crack for sale than what Reams was using. Reams claimed that he arranged to meet Mosely at the carwash so that he could sample the "better" crack. Once they were together in Mosely's vehicle, Mosely produced the larger bag of crack cocaine and then went to the trunk under the pretense of getting a pipe to use to sample the drug. Reams denied telling the officers that he had been selling drugs to pay his way through school.

The jury initially experienced some difficulty reaching a verdict, prompting an <u>Allen</u> charge by the judge,[*] but ultimately convicted Reams of the charge. The conviction and sentence were

---

[*] <u>Allen v. United States</u>, 164 U.S. 492 (1896).

4

affirmed by this court.  See United States v. Reams, No. 00-4183, 2000 WL 1294265 (4th Cir. Sept. 14, 2000) (unpublished).

On February 25, 2002, Reams moved for a new trial based upon an affidavit of Lyndale Justice, who claimed to have been present at the crack house in Durham where Reams met Mosely and first discussed the drug deal.  Justice claims as follows:

> I overheard a conversation between [Mosley] and another man.  I heard [Mosley] talking about moving some "weight."  When I heard that statement, I knew that [Mosely] was referring to selling a large amount of cocaine.  [Mosley] made a statement that he needed to figure some way to make the [Durham Police] pay him.  He also stated that he needed to "get the man off his back."  I also recall him saying that he was going to "pot a plant" which in street terms means he was going to plant something such as drugs on someone.  Later I heard him say something to the effect that "I think I have found my sacrificial lamb."  As he made that statement he gestured over his shoulder with his thumb toward [Reams].

J.A. 147.  Justice states that she moved away from Durham two weeks later and was unaware that Reams had been arrested and convicted until early 2001.  The district court denied Reams's motion for a new trial, and this appeal followed.

## II.

A district court may grant a defendant's motion for a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  However, a district court "'should exercise its discretion to grant a new trial sparingly,' and . . . should do

5

so 'only when the evidence weighs heavily against the verdict.'" United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (quoting United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997)). We review the district court's denial of a motion for a new trial for abuse of discretion. See Perry, 335 F.3d at 320.

To warrant a new trial based on newly discovered evidence, a defendant must show that: (1) the evidence is newly discovered; (2) the defendant used due diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence would probably result in an acquittal at a new trial. See United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. See id.

"[N]ew evidence going only to the credibility of a witness does not generally warrant the granting of a new trial." United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993). However, we have recognized that there may be "an exceptional 'rare case'" where a new trial might be granted "solely on the basis of newly discovered impeachment evidence," if "'the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of

6

previous cases.'" Id. (quoting United States v. Taglia, 922 F.2d 413, 415-16 (7th Cir. 1991)).

Here, the district court found that Justice's affidavit did not entitle Reams to a new trial because it was merely impeachment evidence. The court also found that the evidence did not meet the Custis "rare exception" because Mosely's testimony was corroborated by the officers' testimony and Reams's statements after he was arrested, and because there was no evidence that Mosely had ever lied in other cases or court proceedings. Alternatively, the district court found that the affidavit probably would not produce an acquittal at a new trial, primarily because a reasonable jury would not believe that Mosley sacrificed crack cocaine worth $2,000 to earn a $900 fee as an informant.

On appeal, Reams argues that the district court abused its discretion in finding that the newly discovered evidence is "merely impeaching," because it also corroborates Reams's testimony that Mosely was selling the drugs to him that day. Alternatively, he contends that we should recognize a Custis-type exception here because Mosely's testimony was uncorroborated and essential to the government's case, and because Justice's affidavit rendered Mosely's testimony "utterly unworthy of being believed." Custis, 988 F.2d at 1359 (internal quotation marks omitted). Finally, Reams argues that the

7

district court abused its discretion in finding that the evidence would not likely have resulted in an acquittal at trial.

At trial, Reams's and Mosely's diametrically opposed testimony was nearly singularly focused on the issue of who was the buyer and who was the seller at the carwash that day. Thus, Reams correctly notes that, to the extent Justice's affidavit can be read to impeach Mosely's testimony, it would necessarily have the corresponding effect of corroborating Reams's testimony. As the district court correctly observed, however, the government's case did not "rest[] entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases." Custis, 988 F.2d at 1359 (internal quotation marks omitted). Here, as we explain below, Mosely's testimony was in fact corroborated by other evidence. Additionally, there is no evidence that Mosely, who had acted as an informant numerous times for both the Durham police and federal authorities, had ever lied in prior cases, and Justice's affidavit is far from sufficient to render Mosely's testimony "utterly unworthy of being believed." Id.

In the end, however, it unnecessary for us to decide whether Justice's affidavit was sufficient to satisfy the third requirement of Custis or, if not, whether it should nevertheless

8

be sufficient to bring into play a "rare exception" to that requirement because the district court clearly did not abuse its discretion in ruling that the evidence probably would not produce an acquittal at a new trial. J.A. 164.

Justice's affidavit, dated January 31, 2002, consists of statements allegedly made by Mosely and "overheard" by Justice three years before, while the two were admittedly in a crack house. But even if the jury found the evidence credible, the overheard statements themselves are ambiguous as to whether Mosley intended to plant drugs on Reams or merely to inform on Reams to the police as a way to earn money and leave himself free to conduct his own transaction.

The newly discovered evidence also fails to undermine the evidence which does corroborate Mosely's testimony. Prior to the transaction, the Durham officers searched Mosely and the vehicle, and kept both under surveillance thereafter. They found no drugs and observed nothing that would indicate that Mosely had retrieved drugs that had been successfully hidden during these searches. And, as observed by the district court, the cocaine ultimately seized was worth $2,000, whereas Mosley was only paid $900 as an informant fee.

After the arrest, the officers found crack cocaine in Reams's pocket, as well as a large sum of cash, a cell phone, and a pager. For his part, Reams proceeded to incriminate

9

himself by telling the officers that they could let Mosely go because he knew he had been set up by him, writing out in a statement that his uncle had nothing to do with the transaction, asking how much time a drug trafficking offense would carry if he were convicted, and admitting that he had an alcohol problem and dealt drugs to pay for his college education. Yet, Reams never offered a contemporaneous statement that the 54.5 grams of crack cocaine found on the seat of the vehicle were not his, or were instead brought to the scene by Mosely and planted on him.

Given the strength of the evidence against Reams and the corresponding weakness and ambiguity of the newly discovered evidence, we cannot say that the district court abused its discretion in finding that the verdict would not likely have been different had Reams had the benefit of Justice's statement during the trial.

## III.

For the foregoing reasons, we affirm the district court's order denying Reams's motion for a new trial on the basis of newly discovered evidence.

<u>AFFIRMED</u>

10